Lourie, Circuit Judge, dissenting.
I respectfully dissent from the majority's decision to vacate a thorough and well-reasoned district court decision based on a claim construction issue that is little more than a mirage. In my view, the claims at issue are clearly abstract, regardless of claim construction. Since the majority declines to dispute that conclusion, I submit that we should resolve the legal question of eligibility and simply affirm.
Resolution of this case should have been simple. In Electric Power Group, LLC v. Alstom S.A. , 830 F.3d 1350 (Fed. Cir. 2016), this court, summarizing numerous precedents, held that the analysis, transmission, and display of information are, in themselves, abstract ideas. Id. at 1353-54. That straightforward holding dictates an affirmance in this case, where the claims do not "require[ ] anything other than off-the-shelf, conventional computer, network, and display technology for gathering, sending, and presenting the desired information." Id. at 1355. In this case, that information is toolbar software. J.A. 911 ("[S]oftware being electronically transferred would be considered data in a data stream."); see also Affinity Labs. of Tex., LLC v. DIRECTV, LLC , 838 F.3d 1253, 1258 (Fed. Cir. 2016) (holding that "providing out-of-region access to regional broadcast content is an abstract idea" because it comprises "information distribution that is untethered to any specific or concrete [implementation]").
The claims' breadth illustrates their abstract nature. They cover any toolbar modification, on any of the multitudes of Internet-connected devices, using generic servers and Internet functionality. See, e.g. , '863 patent col. 4 ll. 51-55, col. 9 ll. 17-19, col. 11 ll. 25-43, col. 13 ll. 16-19, col. 18 ll. 32-40. But any invention in using known devices in a new way to transmit data must lie in using the devices themselves differently to accomplish a new process, not simply transmitting a different type of data according to the same process. Cf. Ansonia Brass & Copper Co. v. Elec. Supply Co. , 144 U.S. 11, 18-19, 12 S.Ct. 601, 36 L.Ed. 327 (1892) ("[A]pplication of an old process or machine to a similar or analogous subject, with no change in the manner of application and no result substantially distinct in its nature, will not sustain a patent, even if the new form of result had not before been contemplated.") (citation omitted).
While "inventive programming" may provide an inventive concept in some circumstances, see Elec. Pwr. Grp. , 830 F.3d at 1355, no such programming is disclosed here. Indeed, such programming would necessarily differ widely within the nearly universal range of devices, operating systems, and Internet protocols encompassed by the claims. What remains corresponds only to the familiar abstract ideas of sending data over the Internet between a device and a server and changing the device's display accordingly, captured by the district court as "a process for updating toolbar software over a network without user *1382 intervention." MyMail, Ltd. v. ooVoo, LLC , 313 F. Supp. 3d 1095, 1108 (N.D. Cal. 2018). Thus, the claims are directed only to an abstract idea, not a patent-eligible invention.
Nevertheless, the majority urges the district court on remand to evaluate a factual issue about the meaning of the unclaimed "pinger process," which is the term used by MyMail to describe its claimed method of updating toolbar software. MyMail Br. 8. But the specification is clear that neither the unclaimed pinger process nor the unclaimed MOT script can be the inventive concept. The pinger process itself is not disclosed as the invention, but instead is functionality "assumed to be part of the access service provider." '863 patent col. 11 ll. 42-43. Its teaching on the "MOT script" is no more enlightening. Id. col. 12 ll. 50-51 ("MOT is not, however, an acronym for anything meaningful."); see generally id. (not disclosing any script corresponding to the MOT script). As we have said in the context of claim construction: "[The specification] is the single best guide to the meaning of a disputed term." Vitronics Corp. v. Conceptronic, Inc. , 90 F.3d 1576, 1582 (Fed. Cir. 1996). And so it is here, as in many eligibility disputes. See Cleveland Clinic Found. v. True Health Diagnostics LLC , 760 F. App'x 1013, 1019-20 (Fed. Cir. 2019) ("There is no reason to task the district court with finding an inventive concept that the specification and prosecution history concede does not exist." (citing Secured Mail Sols. LLC v. Universal Wilde, Inc. , 873 F.3d 905, 913 (Fed. Cir. 2017) )).
In any case, we need not look far to discover the pinger process; MyMail explains that it works as follows:
When the user connects to the Internet, the user's machine dispatches an initial pinger message to the access service via the Internet. The pinger message includes information such as the current database revision levels. From this information, the access service determines if the end-user's device should receive updated toolbar data and, if so, sends the updated toolbar data.
MyMail Br. 8 (citations and quotation marks omitted). In other words, the pinger process consists of the idea of programming a generic computer to send certain data (the user's current toolbar software version) to a predetermined server at regular intervals in a conventional manner, and then having the server return certain data (updated toolbar software) in a conventional manner, when the server determines the user's toolbar version is out of date. The pinger process is, as the Appellees argued, more or less exactly what is claimed, and also undeniably an abstract idea under this court's precedent.
For these reasons, I dissent from the majority's decision to remand a case that should be affirmed.